## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARIAN MURPHY, et al.,** | : | |
| | : | |
| **PLAINTIFFS** | : | |
| | : | **Civ. Action No. 07-1241(RCL)** |
| **v.** | : | |
| | : | |
| **DISTRICT OF COLUMBIA, et al.,** | : | |
| | : | |
| **DEFENDANTS.** | : | |

## <u>SUPPLEMENT TO THE ADMINISTRATIVE RECORD</u>

Attached is an index and supplement to the administrative record of proceedings at issue in this action. Provided herewith is a copy of the transcript for the April 10, 2007 and September 13, 2005 hearings.

Respectfully submitted,

LINDA SINGER
Attorney General for the
  District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

*/s/ Edward P. Taptich*
EDWARD P. TAPTICH (012914)
Section Chief
Equity Section Two

1

/s/ *Veronica A. Porter*

VERONICA A. PORTER (412273)
Assistant Attorney General
Civil Litigation Division
Equity Section Two
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C.  20001
(202) 724-6651 (phone)
(202) 727-3625 (facsimile)
veronica2.porter@dc.gov

November 2, 2007

**<u>Murphy v. District of Columbia, 07-1241</u>**

**<u>Index of Supplemental Record</u>**

|  | **<u>Page</u>** |
|---|---|
| 1. Certification of Record | 1 |
| 2. Transcript, 4/10/07 | 2 - 48 |
| 3. Transcript, 9/13/05 | 49 - 86 |

# CERTIFICATION OF RECORD

INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### *STUDENT HEARING OFFICE*
#### SPECIAL EDUCATION

In the Matter RE:      **W██████, D██████ vs. DCPS, Friendship-Edison PCS & IDEAL PCS**

Case Information:      Hearing Dates: 09/13/2005 & 04/10/2007
        Held at: **District of Columbia Public Schools Headquarters**
           **825 N. Capitol Street, N.E.**
           **Washington, D.C. 20002**
        Student Identification Number:  **8458263**
        Student's Date of Birth:  ██████**/1989**
        Attending School: **Friendship-Edison PCS**
        Managing School: **DCPS**
        Hearing Request Date(s): **06/30/2005 & 02/06/2007**

## <u>CERTIFICATION OF RECORD</u>

   I, **Shawnta Maddox, Legal Assistant of the Student Hearing Office,**

DO HEREBY CERTIFY that the attached Record of Proceeding is the entire record in

the above entitled matter as of this date, consisting  of all letters, pleadings, orders,

exhibits and depositions.

   I FURTHER CERTIFY that the materials forwarded herewith are the true copy

of the original documents submitted in this matter.

EXECUTED this Tuesday, October 30, 2007.

            **LEGAL ASSISTANT**
           **STUDENT HEARING OFFICE**

1

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
STUDENT HEARING OFFICE


IN THE MATTER OF D████ W████ `

HEARING DATE:  APRIL 10, 2007


TRANSCRIBED BY
LEGAL PERSONNEL, INC.  (301) 277-5711

<u>APPEARANCES</u>

HEARING OFFICER:                           Sy Dubow

ATTORNEY ADVISOR FOR                        Gwen Harris Lindsey
     DISTRICT OF COLUMBIA
     PUBLIC SCHOOLS

ATTORNEY FOR PARENT                        F. Barrie

1          HEARING OFFICER:  Good morning, we're on the record.  Today

2     is April 10, 2007.  This is an Administrative Hearing for

3     D██████ W███████, born on 9/20, 1989.  I'll ask the parties to

4     introduce themselves for the record.

5          MS. LINDSEY:   Gwen Harris-Lindsey, Attorney Advisor for

6     D.C., Public Schools.

7          MS. BARRIE: Good morning Fatima Barrie, attorney for the

8     parent.

9          MS. MURPHY: Good morning, I'm Marion Murphy, grandmother

10    and legal guardian for D██████ W███████.

11         MR. W███████: Good morning, I am D██████ W███████, student.

12         HEARING OFFICER: This hearing is being conducted pursuant

13    to the Individuals Disabilities Education Act and its Amendments

14    in 2004, 1997 and DCPS regulations to determine whether or not

15    DCPS acted in accordance with these applicable laws with regard

16    to the D██████ W███████.  I'm Sy Dubow, an impartial hearing

17    officer and am not an employee of DCPS nor am I related to or a

18    close acquaintance of the parent other than through the hearing

19    process.  I'll hear both sides and act only on the evidence

20    presented. Is the formal reading of the rights waived?  Ms.

21    Barrie?

22         MS. BARRIE: Yes sir.  Yes sir.

23         HEARING OFFICER: The formal reading of rights is waived,

1   and my decision will be within ten days. All matters discussed

2   today are confidential.   The Hearing is being recorded.   Either

3   party may request a copy of the CD or written transcript by

4   writing to the Student Hearing Office. As a preliminary matter,

5   I have documents labeled 1 through 27 and for DCPS?

6        MS. LINDSEY: None.

7        HEARING OFFICER:  DCPS?

8        MS. LINDSEY: None.

9        HEARING OFFICER: No disclosure, no disclosure letter or

10  nothing?

11       MS. LINDSEY: No.

12       HEARING OFFICER: Opening statement.

13       MS. LINDSEY: Oh.  I have one objection to the disclosure

14  and it is not a complicated one, but just on --.

15       HEARING OFFICER: Which one?

16       MS. LINDSEY: DW number 2. It's one page.

17       HEARING OFFICER: The settlement agreement.

18       MS. LINDSEY: Settlement agreement, but I don't - its no

19  identifying information.

20       MS. BARRIE: It's there, but its sort of mixed up.

21       MS. LINDSEY: Oh.

22       HEARING OFFICER: It's on the second page it has signed by -

23  -.

5

1       MS. LINDSEY: It's just that this page.

2       MS. BARRIE: It's there.  What happened was it got mixed up

3  in faxing it.  It took more than one.

4       HEARING OFFICER: I have it.

5       MS. LINDSEY:  Let me show you, this is what I have for DW2.

6       HEARING OFFICER: Oh, okay.

7       MS. LINDSEY: This.  And this page, and so there is no

8  identifying information. So yours --.

9       MS. BARRIE: And so what I am saying is that it is in there.

10  If you look in there.  It's in there.

11       MS. LINDSEY: I went through it last night, I didn't see it.

12       HEARING OFFICER: It may be out of order?

13       MS. BARRIE: Yeah. Exactly.  Because I had to put mine

14  together too.

15       MS. LINDSEY: Well, based on what Mr. Dubow has - I guess

16  it's alright.

17       HEARING OFFICER: All right. Okay. Ms. Barrie.

18       MS. BARRIE:  All right.  An HOD was issued on September 1st,

19  2005 in which DCPS was --.

20       HEARING OFFICER: 2000 and when?

21       MS. BARRIE: 2005.  In which DCPS was - was ordered to

22  convene a meeting and that's document number - document number

23  24.

6

1        HEARING OFFICER: The HOD is 17 isn't it?

2        MS. BARRIE: 24.

3        HEARING OFFICER: Oh, 9/1/05.

4        MS. BARRIE: Correct.  It gave DCPS time, 30 days to

5   complete the psycho ed and the neuro psychological evaluation

6   and if they do not complete it within the appropriate timeframe

7   the parent had the right to do an independent. It was not

8   completed.  We sent a letter, DW21, 22 and 23.

9        HEARING OFFICER: Now wait a minute.  How can this be

10  possible? He goes to High Road Academy and they conclude they he

11  doesn't receive any special ed services.

12       MS. BARRIE: No, that was – he wasn't at High Road at the

13  time.

14       HEARING OFFICER: Oh, all right.  I'm sorry. What before me

15  now?  I mean – that seems like some of these issues are mooted

16  and they --.

17       MS. BARRIE:  One of the issues is that he was supposed have

18  provided him with two years of compensatory education according

19  to the HOD on paragraph number 4.

20       HEARING OFFICER: Yes.

21       MS. BARRIE: Including one-on-one tutoring services and

22  develop a comp ed plan for him.

23       HEARING OFFICER: Okay.

1       MS. BARRIE: Okay.

2       HEARING OFFICER: Are you saying that's not been done?

3       MS. BARRIE: Exactly, we're asking for independent one-on-
4   one tutoring.

5       HEARING OFFICER: Is that the only issue?

6       MS. BARRIE: And they need to review the evaluation and
7   issue an updated IEP for him.

8       HEARING OFFICER: Shouldn't High Roads do that?

9       MS. BARRIE: They attempted to hold a meeting in January,
10  but the grandmother testified to the fact she was there and her
11  advocate was there but DCPS wasn't there, the psychologist
12  wasn't there --.

13      HEARING OFFICER: So--.  So they can still do an IEP at High
14  Road, right?

15      MS. BARRIE:  Well, sometimes they do, but that's if they
16  have an agreement from DCPS to go ahead without DCPS. But
17  because there are outstanding issues and some things may be
18  added to the IEP that DCPS may not be in agreement with, they
19  normally would rather have DCPS present at these meetings.

20      HEARING OFFICER:  Wait a second.  Does it have it under
21  services rendered?

22      MS. BARRIE: I'm sorry?

23      HEARING OFFICER:  DCPS didn't show, what effect does that

1  have on the services rendered at High Road?

2      MS. BARRIE:  Well the new evaluations were never included

3  on his IEP and his IEP from 05, and they attempted to hold a

4  meeting but the psychologist wasn't there to review the notes.

5      HEARING OFFICER:  But you and I both know that High Road

6  has this completed related program that tries to gauge what

7  level the student is at and then adjust the curriculum to meet

8  the child's needs at that – after they do their testing at High

9  Road.

10     MS. BARRIE:  Okay.

11     HEARING OFFICER:  So why – why isn't High Roads doing that?

12     MS. BARRIE:  Well, I can't hold High Roads responsible –

13  the only people we can hold responsible for what was ordered on

14  the HOD is DCPS. We can't say High Roads it is your

15  responsibility, you know.

16     HEARING OFFICER:  Where is the denial of FAPE?

17     MS. BARRIE:  Okay, the fact that they violated the Hearing

18  Officer's determination.

19     HEARING OFFICER:  That doesn't necessarily mean that there

20  is a denial of FAPE.

21     MS. BARRIE:  Well, under Blackmon Jones there is a rebuttal

22  presumption of a denial of FAPE number one, and number two, up

23  to the now the comp ed hours have not been provided to the

1    student.

2    HEARING OFFICER:  So that's the only issue, they haven't

3    provided comp ed?

4    MS. BARRIE:  And they haven't updated his IEP.  And they

5    haven't coordinated the HOD met to review that --.

6    HEARING OFFICER: Oh, I don't know about that.  I mean if he

7    is at High Road Academy, High Road – that's one of their things

8    they always argue that they take care of updating to make sure

9    that the student's curriculum and that they are re-evaluated.

10    They do the evaluations, right?

11    MS. BARRIE:  No, they don't do the evaluations, DCPS does

12    evaluations. I think you are mixing it up with Rock Creek

13    Academy.  They sometimes do some evaluations, not all. But High

14    Roads do not do any evaluations at all.  DCPS does all the

15    evaluations for them.  And Rock Creek does some.

16    HEARING OFFICER:  And what does it matter? If he is an

17    full-time special ed program, for learning disabled students,

18    it's at the academy, and High Road again for learning disabled

19    students, and they – you're saying that their IEP is out of

20    date, that the IEP isn't right?

21    MS. BARRIE:  Yes.  It's out of date, yes sir.  The last IEP

22    was done October 11th.

23    HEARING OFFICER:  Where is it?

10

1    MS. BARRIE:  Document number 18.

2    HEARING OFFICER:  Anything further, go ahead.

3    MS. BARRIE:  Okay, and we would like - we would like the

4    meeting to take place post haste and would like it to happen

5    even if the DCPS is not there, so that we can make sure that a

6    meeting does take place, because unfortunately for us, we can't

7    really control what happens when we go to these meetings.  And

8    if it is scheduled and the attorneys is the there, the advocate

9    is there, and we're ready to move forward and DCPS is not there,

10    of course we would request that we be allowed to move forward

11    with the meeting without DCPS because he needs an updated IEP,

12    now.  Due to the fact that the IEP is from 2005, and we're now

13    in 2007, and these evaluations have not yet been included in

14    this - in his IEP and the evaluations are the neuro psych and

15    the psycho ed which are exhibit 19 and 20 documents number 19

16    and 20.  And we need to make sure that all the services - the

17    recommendations in those evaluations are included.  And then the

18    IDEA, he must have an updated IEP annually, or at least when

19    necessary.  And in this case it is necessary, well more than

20    necessary because it is past the date that evaluations - that

21    review of the evaluations should have taken place.  That he

22    should have had an updated IEP so he can receive the appropriate

23    services that he needs.  And of course as I indicated, the

1   paragraph 4 of the HOD, compensatory education plan that needs

2   to be completed and we are asking for an independent.

3       HEARING OFFICER:  Counsel for DCPS.

4       MS. LINDSEY: I'll do the easiest one first.  The comp ed

5   issue. This HOD is inconsistent with the prior one that put

6   Friendship Edison --.

7       HEARING OFFICER: Prior one --.

8       MS. LINDSEY: There are three HODs.

9       HEARING OFFICER: What number is that?

10      MS. LINDSEY: Number DW17.

11      HEARING OFFICER:  17.

12      MS. LINDSEY: That says that Friendship Edison is

13  responsible for comp ed for the 04 -.

14      HEARING OFFICER:  Is this Mr. St. Clair's.

15      MS. LINDSEY: Yes sir.

16      MS. BARRIE: Mr. Jones.

17      MS. LINDSEY: No, Mr. St. Clair.

18      HEARING OFFICER: The one March 15th?

19      MS. BARRIE: Oh, the March 15th.

20      MS. LINDSEY: Yeah, it says --.

21      HEARING OFFICER:  It says issues concerning comp ed from

22  the date of matriculation of the student at Friendship Edison to

23  the day are reserved.

1      MS. LINDSEY: Then it says under paragraph - right.  To be

2    discussed at the meeting.  It says -number 3.  Where it says

3    that at the meeting formal amount delivery of comp ed up to date

4    of matriculation would be discussed and determined.  So this

5    subsequent HOD that says DCPS is to provide the comp ed is

6    inconsistent with the --.

7      HEARING OFFICER:  That's Mr. Jones' one, which one is that?

8    That's 20 --- 20 --.  Is that the one we just talked about?  20 -

9    -.

10     MS. LINDSEY: 24.  I think the two are inconsistent.  Now,

11     HEARING OFFICER:  20.

12     MS. LINDSEY: Friendship Edison is obligated for this period

13   to time for when he started at Friendship Edison through - what

14   does it say here?  I guess it has to be up through when he went

15   - when he got to High Road.

16     MS. BARRIE: They say matriculate --.

17     MS. LINDSEY: Up to the time --.

18     MS. BARRIE: When he - matriculated up when he went to

19   Friendship Edison at the time of this.

20     MS. LINDSEY: No, that's not what this says.

21     MS. BARRIE: Yes it says --.

22     MS. LINDSEY: Wait. Wait. Wait.  Up to the date of

23   matriculation to Friendship Edison will be discussed. But

13

1    Friendship Edison has a comp ed issue. Because this whole case

2    was when Friendship Edison was brought back in because the

3    student attended Friendship Edison and they were on – and this

4    why Friendship Edison and DCPS were to participate in the

5    meeting because they both had some culpability according to

6    these HOD's.

7        HEARING OFFICER: Which one?

8        MS. LINDSEY: The one that Mr. St. Clair --.

9        HEARING OFFICER: Her first one?

10       MS. LINDSEY: Yeah.

11       HEARING OFFICER: March 15th.

12       MS. LINDSEY: March 15th. There are two – there are two

13   schools because the student went to Friendship Edison in the

14   two-year period that is covered in this HOD.  I mean – so --.

15       HEARING OFFICER: You're saying that Friendship Edison is

16   responsible for --.

17       MS. LINDSEY: For some period of time.  I'm don't know if –

18   for some period of time Friendship Edison had some culpability

19   or had some requirement to participate in the comp ed

20   discussion.  And if you look at the notes that the team – it's

21   January 17th, 2007.

22       HEARING OFFICER: Which one is that?

23       MS. LINDSEY: January 30, DW25. You see that there was

14

1    indication that High Roads – High Roads indicated that they

2    attempted to contact when they were supposed to have DCPS – let

3    me see if that is the right one – no I'm sorry I apologize Mr.

4    Dubow, it's the 10/11/05 – DW18.  I apologize.  Those notes

5    indicated that High Roads and DCPS were supposed to participate

6    --.

7          HEARING OFFICER: DW 18. In back of the IEP.

8          MS. LINDSEY: Right.  Yes, the first page of the IEP meeting

9    notes.  Both Friendship Edison and DCPS apparently were to be a

10   part of this meeting to discuss the comp ed.  So I just – my

11   only issue – my problem is the way it is being set out now is

12   DCPS's – counsel is asking the Hearing Officer to order DCPS to

13   provide comp ed or to be responsible for funding comp ed for a

14   period of time – one it's not clear – what period of time we're

15   talking about. We're excluding the period of time that

16   Friendship Edison was involved and that needs to be clearly set

17   out.

18         HEARING OFFICER: Okay, its says here parent advocate is

19   requesting 400 hours of comp ed for related services and

20   specialized instruction per 9/25/05 HOD.  Alright.  HOD.  9/25.

21   Is that St. Clair's?

22         MS. LINDSEY: No.

23         HEARING OFFICER: 9/25 is Jones.

15

1       MS. LINDSEY: There is no 9/25.

2       MS. BARRIE: Jones --.

3       MS. LINDSEY: It's 9/1/05.

4       HEARING OFFICER: Huh?

5       MS. LINDSEY: There is no 9/25.

6       MS. BARRIE: HOD.

7       MS. LINDSEY: HOD.

8       MS. BARRIE: It's September --.

9       HEARING OFFICER: The notes say 9/25.

10      MS. LINDSEY: HmmmHmmm.

11      HEARING OFFICER: 9/27.

12      MS. LINDSEY: Right.  And I was looking and didn't see that.

13      HEARING OFFICER: There's no 9/27/05.

14      MS. BARRIE: We have a 9/01/05 HOD.

15      HEARING OFFICER: You have a 9 -.

16      MS. BARRIE: 01/ --.

17      HEARING OFFICER: 05?  Where's that?

18      MS. BARRIE: That's 24.  That's the HOD that's in dispute.

19      HEARING OFFICER: That's Mr. Jones'.

20      MS. BARRIE: Yes sir.

21      HEARING OFFICER: Oh, okay.

22      MS. BARRIE: That's number 24.

23      MS. LINSDEY: I mean if that's the period of time we're

16

1    going to talk about, then I will hold counsel to their – their

2    re-representation.  They're re-showing because I don't

3    necessarily – if DCPS is going to be made to fund --.  That HOD

4    is wholly inconsistent with the prior HOD, where there is period

5    of time that the student was not in DCPS and was at Friendship

6    Edison.  So, if that is – if --.

7        HEARING OFFICER:  The student was at Friendship Edison and

8    then from Friendship Edison went to High Road--.

9        MS. BARRIE: Yes sir.

10       HEARING OFFICER: He should have never went into DCPS

11   school.

12       MS. BARRIE:  Well there's an Order of paragraph four –.

13       HEARING OFFICER: I'm asking you now – that's just separate

14   from that, I'm just trying to determine if between the

15   Friendship Edison and the High Road, is there any other school?

16       MS. BARRIE: No sir.

17       HEARING OFFICER: So its just Friendship Edison, somebody

18   ordered it, was he ordered by an HOD to go High Road?

19       MS. BARRIE: The March HOD.  Mr. St. Clair's HOD.

20       HEARING OFFICER: Subject to the settlement agreement.

21       MS. LINDSEY: The HOD before it.

22       HEARING OFFICER: On an interim basis, they'll fund him at

23   High Road.

1        MS. BARRIE: Correct.

2        HEARING OFFICER: It's only been three years, some kind of

3    interim.

4        MS. LINDSEY.  That's why there is no such thing as interim,

5    that's why I say that.

6        MS. BARRIE: And paragraph two indicated that within 30 days

7    of matriculation at High Road, DCPS will convene an MDT/IEP

8    placement meeting during which evaluations will be reviewed --.

9        HEARING OFFICER: Are you saying that High Road Academy is

10   not an appropriate placement?

11       MS. BARRIE: No.

12       HEARING OFFICER: Okay.  If it is an appropriate placement,

13   then it means that he must be getting benefit there.

14       MS. BARRIE: Okay, what does that have to do with an Order,

15   it's matter that we have to discuss comp ed, the order says DCPS

16   shall provide - and they haven't provided.

17       HEARING OFFICER: And that's under comp ed issue, okay.

18       MS. BARRIE: I mean, all right. It's already been

19   determined.  It isn't a matter of trying to determine it, it was

20   already determined. It was already ordered.  And what we're

21   asking for is because it hasn't yet been implemented as ordered

22   by the HOD --.

23       HEARING OFFICER: Her position is that the student was - is

1    - Friendship Edison should provide.

2        MS. BARRIE: That should have been done when the HOD came

3    out.

4        HEARING OFFICER: Then he made a mistake then.  Why is it

5    the responsibility of the DCPS, if there was a lack of services,

6    Friendship Edison is its own LEA. So, if Friendship Edison did

7    not provide services there, there're not here at the table.

8        MS. BARRIE: No they are not because this HOD is not against

9    Friendship Edison.

10        HEARING OFFICER: That HOD may be wrong.  That HOD is on its

11    face wrong.

12        MS. BARRIE: The HOD was ordered --.  They should have

13    appealed it. They could have appealed it.

14        HEARING OFFICER: People make mistakes.

15        MS. BARRIE: They should have appealed it, at least with a

16    motion for reconsideration. That wasn't done in this case.  And

17    the time that have passed, and we can't now come and ask another

18    Hearing Officer to overturn a Hearing Officer's determination

19    that was done, that was already ordered, what paragraph 4 is

20    clear.  It is not a matter of discussing. The previous HOD asked

21    for discussion.  It didn't happen. We came again.

22        HEARING OFFICER:  Yeah, but I'm not a potted plant. In

23    other words, I'm not just hear to rubber stamp what somebody

1    else does --.

2        MS. BARRIE: Oh.

3        HEARING OFFICER:  That may be wrong.  I mean, I can

4    understand that DCPS will be responsible if he was at a DCPS

5    school, but he is not - the student wasn't at a DCPS school.

6    The student was at Friendship Edison.  And they are not here

7    today.  So Friendship Edison is the one that should be involved

8    with that issue.

9        MS. BARRIE: All we know is there is an HOD is September.

10        HEARING OFFICER: I understand that.

11        MS. BARRIE: Right.  The HOD ordered a meeting to be held

12    after reviewing the evaluations are completed. They didn't

13    happen. The HOD also ordered that they provide the student with

14    one-on-one tutoring services and develop a comp ed plan,

15    including (inaudible) hours and (inaudible).  That didn't

16    happen.  It was an Order to be done, it wasn't ordered to be

17    discussed.  And as a result the determination has already been

18    made and since DCPS had time to where they could have appealed

19    it, or at least made a motion for reconsideration, they didn't

20    do it.  That timeline has passed and because they have not done

21    it, the HOD is binding and as a result, they have to comply with

22    it.

23        MS. LINDSEY: That being said, Hearing Officer, the

1    presumption of a denial of FAPE is a rebuttal --. First of all

2    Blackmon Jones, everyone says it, but no one shows me the case

3    site that actually says it.  The consent decree indicates that

4    when is a claim for comp ed that's being made under Blackmon

5    Jones there is a rebuttable presumption of harm.  Rebuttable

6    presumption of denial of FAPE or harm. So now that presumption

7    can be rebutted. Counsel has the indicate how this provision

8    here, or this student is at a full time day program where Mr.

9    Weeks has always stayed, whether the child has a full time IEP,

10   no IEP, or piece of IEP, they can bring that child into the

11   school system -- into their program and service them.  And he

12   has said that on several occasions and I'd be very happy to pull

13   records where he said that. So based on his prior

14   representations and several hearings - in several hearings, I'd

15   like to know how it is the student has been harmed, how he has -

16   how there has been educational detriment --.

17       HEARING OFFICER: Oh, what about (inaudible)?  What does

18   that effect in terms of - what is the student has been High Road

19   for a couple of years, and what if he is up to the level where

20   he is supposed to be and comp ed is not necessary?

21       MS. LINDSEY: Then he doesn't get comp ed.  He don't get

22   comp ed.  Comp ed - you don't get it just to get it; it has to

23   be a need for it.  It has to be shown and demonstrated need --.

1          HEARING OFFICER: Well we don't have that.  Where is he at

2     High Roads? We don't have the information.

3          MS. BARRIE: No, we don't have an updated cognitive

4     evaluation – no, I'm sorry – cognitive evaluation.

5          HEARING OFFICER:  You got an HOD that's two years, when he

6     was just starting High Roads.

7          MS. LINDSEY: Exactly.

8          HEARING OFFICER: He may now be --.

9          MS. LINDSEY: He may not need it.

10         HEARING OFFICER: He may not need it according to Reid.

11         MS. LINDSEY: I've heard – based on Ms. Barrie's

12    representation, I've heard contrary that the private schools can

13    move forward on services for students – on developing an IEP for

14    students from DCPS's.

15         HEARING OFFICER:  High Road does move forward.  I have not

16    – I'm not the first. I'm not a new Hearing Officer. I'm an old

17    Hearing Officer, very old Hearing Officer.  And I have heard

18    from High Roads a thousand times and I know they adjust the

19    needs of the students. I mean if you want to put him on, put on

20    a witness telling me – that's find. But I take judicial notice –

21    otherwise you'd be saying it is not an appropriate placement.

22         MS. BARRIE: I never said it was not an appropriate

23    placement.

1       HEARING OFFICER: Well then at then he is getting some

2   benefit there.

3       MS. BARRIE: DW25 at the meeting notes from January 30th, 07,

4   where the parent was there, the advocate was there, and

5   according to the notes, they indicated that they couldn't move

6   forward because the psychologist wasn't there, and DCPS wasn't

7   available.

8       HEARING OFFICER: They may not have moved forward, but they

9   have an IEP for this student, I see it, it's in the record.

10  They have an IEP.

11      MS. LINDSEY:  They are servicing the student from

12  something.

13      MS. BARRIE: From October of 05. Correct. You're correct.

14  They have an IEP on the record from October of 05.  And at that

15  meeting, Ms. (inaudible) asked for vocational – vocational --.

16      HEARING OFFICER:  But you know, that High Road Academy, I

17  take judicial notice of it, because they tell me every time that

18  this is the uniqueness of the program. They take the student and

19  they individualize his program based – and they keep adjusting

20  this program through the computer already set-up that they have

21  at that school.  That's – they tell that to me every time they

22  come to testify from High Roads, which means that they are

23  constantly modifying the program to meet the needs as the needs

23

1    changes.

2        MS. BARRIE: All we're saying is that there is HOD that

3    orders some things to be done and it wasn't done.  And DCPS was

4    ordered to do it, and they did not do it.

5        HEARING OFFICER: Well, I have to see a denial of benefit.

6        MS. BARRIE: Number two, when we went to the meeting in

7    January, the meeting did not move forward, indicating that

8    because DCPS wasn't there, there was no psychologist there to

9    review the neuro psych and the psycho education evaluation and

10   at the time Ms. (inaudible) also for vocational evaluation, and

11   due to the fact he is over 16 years old, nothing has been done

12   as far as we are aware – has been done for this child.  And this

13   is as far as the evaluation is concerned, the tutoring is

14   concerned and the updating of the IEP is concerned. None of that

15   has been done, and as a result it needs to be done. And it was

16   ordered.

17       HEARING OFFICER: Why do you need more evaluations unless

18   you are unsatisfied with that placement.

19       MS. BARRIE: A vocational.  He needs.

20       HEARING OFFICER: You didn't ask for a vocational.  That is

21   not what you are asking for.  You are asking for a vocational

22   assessment?

23       MS. BARRIE: A vocational assessment, the HOD violation,

1  which is in the complaint.

2      HEARING OFFICER:  Where is the vocational assessment in the

3  HOD?

4      MS. BARRIE:  It is not in the HOD it is in complaint.

5      HEARING OFFICER:  Well now that is separate.

6      MS. BARRIE:  Separate from the HOD. I know we are still

7  talking about the HOD, I understand that. But I just want to

8  wrap - put in all in the before I forget. Because I know I may

9  forget.

10      HEARING OFFICER:  Well were was the vocational assessment

11  raised in any of these issues that was raised at the High Roads?

12      MS. BARRIE:  At the meeting in January.

13      HEARING OFFICER:  Where is that?

14      MS. BARRIE:  January - DW 25, the second page of the

15  meeting notes.

16      HEARING OFFICER:  Where is the mention of vocational

17  assessment?

18      MS. BARRIE:  The last page, the second page, the January

19  30th, 07.  DW25.

20      HEARING OFFICER:  Okay.

21      MS. BARRIE:  And also he still have (inaudible) - by which

22  case I didn't realize that would be - actually be a contesting

23  of what was ordered in the HOD, but case law have found that a

1  violation of an Hearing Officer's determination and don't have

2  the case law with me, but I didn't expect the HOD to actually be

3  - since it was clear cut, I didn't expect it to be opposed, but

4  there has been case law that has found that a violation of HOD

5  or failure to implement an HOD is a denial of FAPE. And it has

6  been determined that it is harm.

7       HEARING OFFICER:  The problem I have is students coming

8  from Friendship Edison, whoever was at Friendship Edison is the

9  one who owes the comp ed, not DCPS.  I can see that from the

10  documents, so if an HOD is on its face wrong, I'm supposed to

11  implement something that I know is wrong. I'm not going to do

12  that.  Friendship Edison is not here to defend themselves, so I

13  don't know what the story is.

14       MS. BARRIE: They are not in the complaint - - so they can't

15  --.

16       HEARING OFFICER:  They are the party to this.  There are

17  the party that should be involved with the comp ed. And the

18  other point is that the student has been going to High Road

19  Academy for over two years and I - and you have the burden to --

20  .  I mean I don't know where there has been lost of benefit at

21  the time and at what level and - what level is he at, if the

22  student has a deficit according to Reid that require some much

23  comp ed to bring him up. May be - may be have, he may not have a

1   deficit.  It's not in the record is it?  I don't have the

2   current information.

3       MS. BARRIE:  We don't have updated evaluations. The only

4   evaluation we have is the psycho ed and the neuro psych that was

5   done in 05.  And that's why we need to meet.

6       HEARING OFFICER:  You have a psycho ed for what date?

7       MS. BARRIE:  05.

8       HEARING OFFICER:  You don't anything and that's 05.

9       MS. BARRIE:  Right.  We don't have anything updated.

10      HEARING OFFICER:  That's two years ago.

11      MS. BARRIE:  Updated and what we are asking for --.

12      HEARING OFFICER:  So we don't have anything - we don't have

13  anything from 07.

14      MS. BARRIE:  That's why we need to move.

15      HEARING OFFICER:  From 07 - and we're in April now as to

16  how he is doing at High Road, and to his gaps.  Right.

17      MS. BARRIE:  We don't have updated copies of--.

18      HEARING OFFICER:  So what you're asking me is give - DCPS

19  two years of comp ed in the form of one-on-one tutoring, totally

20  I guess 400 hours is what you're requesting, is that right? 400

21  hours, is that right - is that still what you are requesting?

22  400 hours?  That is what your advocate is present requesting.

23      MS. BARRIE:  Requested at the meeting, correct.

27

1    HEARING OFFICER:  400 hours that they should provide,

2  right, even though we don't know where he is at currently. So

3  maybe and I don't even know if what area to provide the tutoring

4  – what areas he needs the tutoring because I have nothing from

5  High Roads to indicate where his deficits are. I mean why should

6  he have to go through all this tutoring if he doesn't need it or

7  may be why should be ordered to get certain type of tutoring

8  when he may need another type of tutoring.

9    MS. BARRIE:  Well when we are doing independent tutoring,

10  we have an independent tutor who works with him and would know

11  exactly where he needs to be tutoring, and that is usually how

12  it works.  It's already been ordered, the determination was

13  already been made.

14    HEARING OFFICER:  Yet but the Order --.

15    MS. BARRIE:  I didn't come here --.

16    HEARING OFFICER:  Yeah, but the Order is wrong.  The Order

17  on its face is wrong because the student was at Friendship

18  Edison and Friendship Edison was responsible, not DCPS.  Any

19  problems that occurred at Friendship Edison. It has its own LEA

20  and they are not a party.

21    MS. BARRIE:  And – Mr. Dubow.  Mr. Hearing Officer, DCPS--.

22    HEARING OFFICER: I'm frustrating you, I know.

23    MS. BARRIE:  (laughter).

1      HEARING OFFICER:  But it is very difficult to me to enforce

2  an order than on its face is wrong.

3      MS. BARRIE:  They should have done something about it.

4  When we did our orders.

5      HEARING OFFICER:  Yes, but I'm not going to compound it –

6  I'm not going to compound --

7      MS. BARRIE:  When we get our orders --.

8      HEARING OFFICER:  I'm not going to compound it further.

9      MS. BARRIE: If we get our orders and our orders are not

10  quite what was supposed to have happened --.

11      HEARING OFFICER:  But it is the wrong party.

12      MS. BARRIE:  When we come to the table, they always us tell

13  us, Ms. Barrie you should have addressed it when you first

14  issued Ms. Barrie, you can't address it now at the table.

15      HEARING OFFICER:  The other thing is this is over two years

16  old.

17      MS. BARRIE:  It's the same thing.

18      HEARING OFFICER:  It's over two years old.

19      MS. BARRIE:  Well actually it is not over two years old.

20  It was September of 05.

21      HEARING OFFICER:  Close.

22      MS. BARRIE:  But it is not over two years ago.

23      HEARING OFFICER:  But why did you take so long if you

29

1    didn't get it to come back in here now and say he didn't get his

2    - why didn't you try to get this when he first started at High

3    Road?  And if there was a problem, it might have been spotted

4    earlier.  But the main thing is under Reid, you're supposed to

5    be looking at where the child is currently and provide services

6    to bring them up for services not rendered.

7        MS. BARRIE:  That is if we're coming, requesting comp ed

8    based on the level of services, based on what the student is

9    receiving. But we came here based on the fact that it was

10   already determined previously. There is not HOD that has already

11   determined, it shall be provided by DCPS and that is what it

12   says.

13       HEARING OFFICER:  What's the basis of fact in that HOD to

14   support that finding? You show me where in that HOD that there

15   is a basis for awarding two years.  Every Order has to have some

16   findings of fact to support its words.  If it doesn't then there

17   is no basis for it.  All right. I don't understand these orders,

18   in deference to my fellow Hearing Officer. They said the issue

19   concerning comp ed from the date of matriculation to the student

20   at Friendship Edison to the date hereof are reserved. It is

21   reserved. It means that they are not, nobody's decided anything.

22   Then he's got a paragraph before, for the amount of delivery of

23   comp ed up to date that the student matriculated, matriculated

1  to if any.

2      MS. BARRIE:  Matriculated to Friendship Edison.

3      HEARING OFFICER:  That means – that means--.

4      MS. BARRIE:  Up to the time he got to Friendship.

5      HEARING OFFICER:  At the time he went to --.

6      MS. BARRIE:  Friendship Edison.

7      HEARING OFFICER:  Right.

8      MS. LINDSEY:  Here's also the problem and I don't want to

9  try to – trying to muddy the water any further, -- let me

10  finish.  On this HOD is dated --.

11      MS. BARRIE:  Which one?

12      MS. LINDSEY: 9/1/05.  The one you are looking at, Mr.

13  Jones' DW24, it started with counsel saying at the time of this

14  Hearing the student was not at High Road, which is totally

15  inconsistent with DW12, where High Roads made an addendum to the

16  IEP added services and moved forward and noted that Ms. Harrison

17  wasn't at the meeting. But they were moving forward.

18      MS. BARRIE: Huh?

19      MS. LINDSEY: So at the time they came to this Hearing, he

20  was at High Roads --.

21      MS. BARRIE: But he also --.

22      MS. LINDSEY: Let me finish.  Let me finish.  Please. He had

23  a full time IEP at High Roads, and High Roads had already made

1    changes to an IEP.  So now we come in here and say only in

2    January all of the sudden High Roads saying, they said can't

3    move forward because DCPS and Friendship aren't here.  That's on

4    the comp ed issue.  That's for comp ed. That's not for

5    implementation or development of services.  High Roads developed

6    an IEP in October of the next school year of 05. Where they did

7    a transition service plan and have goals and objections for

8    transition services. So, he has IDEA has been met as far as

9    transition services. There is no obligation or trigger to do a

10   vocational evaluation. What the LEA is required to do is to

11   provide transition services.  And High Roads – since was at High

12   Roads did that.  And that's part of the record. So, I'm – this

13   is a – this is a horrible IEP.  It's inconsistent – the facts

14   are inconsistent from the Order.  He was at High Roads.

15        HEARING OFFICER: What do you mean a horrible IEP?

16        MS. LINDSEY: I mean – sorry. This is a horrible HOD. It is

17   totally inconsistent.  The student had been High Roads and gone

18   to Summer School at High Roads. And the team had indicated that

19   he was doing well at High Roads.  And everyone was happy with

20   the High Roads Placement.

21        HEARING OFFICER: Where is that?

22        MS. LINDSEY: DW12.

23        HEARING OFFICER: That's 05 right?

32

1      MS. LINDSEY: That's 05.  That is before.  This is before

2    this HOD. 5/25/05 and they indicated that everyone was happy.

3    And they feel this placement is appropriate. And there are

4    changing the IEP to add this hour and a half of psychological

5    counseling every week. And they talked about comp ed and said

6    they wanted the tracker forms from 2002 to present to look to

7    consider this - the comp ed issue. And a review of the record

8    indicates the request for comp ed - the request for tracker

9    services - tracker notes went to Friendship Edison because

10   that's where he was in school prior to. Mr. Jones and it's

11   carelessness - which is why we always file our office always

12   files a motion to clarify that we are not a part of the case

13   because when a charter school, an LEA charter school is named,

14   the HOD comes back DCPS.  DCPS.  Instead of identifying the LEA.

15   Now regardless of - I understand what Ms. Barrie what she is

16   saying but I do not agree that you implement an HOD that clearly

17   makes no sense and is inconsistent with all reason and fact.

18   That is exactly what this is.  It's inconsistent with

19   everything. There is no way in the world that DCPS could have

20   provided encounter-tracking forms when the student had been at

21   Friendship Edison.  And I don't know how Mr. Jones gets the

22   conclusion that he hadn't received special education services

23   when he was at High Roads at this time and had been there in the

1  prior school year.  Mr. St. Clair placed him there in March.

2      MS. BARRIE: Well the cover of the HOD does say High Roads

3  Academy. I misspoke initially.  I apologize for that.  But the

4  cover of the HOD does say High Road Academy.  What does he say

5  that's he not High Road?

6      MS. LINDSEY: You say that he wasn't at High Roads.

7      MS. BARRIE: Yeah, that is what I'm saying, I misspoke.  The

8  cover of the HOD does have High Roads.

9      MS. LINDSEY: And it says, it also says that Mr. – Mr. Dubow

10  says the student did not receive any special education services,

11  which is inconsistent with it --.  One in four totally

12  inconsistent.

13      HEARING OFFICER: That's how I see it.

14      MS. BARRIE: The HOD in March indicated, they said at the

15  same MDT/IEP placement meeting the former (inaudible) comp ed up

16  to the date, in other words before he got to Friendship Edison,

17  if any will be discussed and determined. Prior to him getting to

18  Friendship Edison.  DCPS was supposed to have a meeting to

19  discuss and determine the amount of comp ed or formulate an

20  amount of comp ed prior to his starting at Friendship Edison.

21  This HOD then states that DCPS fails to comply with the HOD

22  dated and issued March 16th, which is back to the previous HOD.

23  DCPS fails to provide any encounter tracking forms which the

1  verify the performance of related services, paragraph 3,

2  paragraph 4.  (Inaudible) conclude that D█████ did not receive

3  any special ed services. D█████ was in regular classes and

4  that's paragraph 4.  And this was not disputed by DCPS.  In this

5  case, DCPS failed to sustain its burden of proof. DCPS did not

6  have any witnesses to verify the performance. In light of the

7  forbearing a directed verdict was granted and disclosed in

8  November – September 1st 05 HOD that I just read from.  And this

9  was the directly as a result of the March 05 HOD violation. And

10  now we're here for the September 05 HOD violation.  This HOD was

11  based on what was ordered here which was that DCPS was to

12  determine comp ed prior to his (inaudible) at Friendship Edison.

13  They didn't do it.  They didn't show any evidence of services

14  being provided prior to attendance at Friendship.  And whatever

15  else had to do with Friendship that is separate and apart from

16  this Order. That is separate and apart from the March Order.

17  The March Order totally took out Friendship and just ordered the

18  meeting to be held to discuss any services before he got to

19  Friendship.  They didn't happen.  And in September, --- not

20  September, the hearing actually took place August 18th.  They

21  didn't show.  They didn't meet their burden. As a result, the

22  HOD in September ordered – awarded the compensatory education

23  against DC Public Schools. Not because of what may have happened

1  at Friendship or because of what happened before he got to

2  Friendship, and that is what this March 05 HOD was talking about

3  as far as DCPS was concerned.  Not Friendship.  And as a result,

4  we're asking that this HOD September 1st, 05 HOD document number

5  DW24 --.

6      HEARING OFFICER: Have you heard of such a thing as latches.

7  I mean how long can you wait before you bring a complaint, this

8  September 05.

9      MS. BARRIE: Okay. According to the IDEA we have two years.

10      HEARING OFFICER:  But why is this such problem--.

11      MS. BARRIE:  You have two years.

12      HEARING OFFICER:  If they didn't comply

13      MS. BARRIE:  Under the IDEA.

14      HEARING OFFICER:  Why are you waiting to almost over three

15  years.

16      MS. BARRIE:  It's still within the two years; it's not even

17  two years. It's within the two years. Under the IDEA we have two

18  years, and it's within the two years.

19      HEARING OFFICER:  We have two years to what?

20      MS. BARRIE:  To file a complaint on any issues within two

21  years.  And it's way within the two years.

22      HEARING OFFICER:  The rule says --.

23      MS. BARRIE:  September 06 was two years.

1      HEARING OFFICER:  Do you wish to call any witnesses or put

2  on any additional evidence to your documents?

3      MS. BARRIE:  Let's see.

4      HEARING OFFICER:  We'll go off the record why you consult.

5      MS. BARRIE:  Oh, thank you.

6      HEARING OFFICER:  Do you swear or affirm that the testimony

7  you are about to give is the truth?

8      MS. MURPHY: I do.

9      HEARING OFFICER: State your name for the record?

10     MS. MURPHY: Marion Murphy.

11     HEARING OFFICER: And you relationship to the student?

12     MS. MURPHY: Grandmother.

13     HEARING OFFICER: Your witness.

14     MS. BARRIE:  Ms. Murphy, I just have a couple of questions

15  for you.  Has D██████ received any tutoring services since

16  September of 05?

17     MS. MURPHY:  No.

18     HEARING OFFICER: Has he received any?

19     MS. BARRIE: Tutoring services since September of 05.

20     MS. MURPHY: No he hasn't.

21     MS. BARRIE:  Okay. Have you been contacted by DCPS to

22  convene an IEP meeting for D██████ since September of 05?

23     MS. MURPHY:  No.

37

1     MS. BARRIE:  Okay.  Did you ever go to High Roads for any

2  meetings for D███████?

3     MS. MURPHY:  Yes.

4     MS. BARRIE:  Okay.  Do you remember when?

5     MS. MURPHY:  We went January of 06.  And I was there and

6  Ms. Presley was there, and she did I think Ms. James did make a

7  call trying to connect with somebody at DCPS about being at the

8  meeting, but some kind of way, whoever the person was that was

9  supposed to be there wasn't there.

10     MS. BARRIE:  Did the meeting go forward?

11     MS. MURPHY:  No.

12     MS. BARRIE:  It didn't?

13     MS. MURPHY:  No.

14     HEARING OFFICER: The meeting in 07?

15     MS. MURPHY: Yes.  January.  January the 30th of 07 I think

16  it was.

17     HEARING OFFICER:  Wait. Wait a minute.  I have meeting

18  notes.

19     MS. BARRIE:  That's DW25.

20     HEARING OFFICER: 1/30/07.

21     MS. BARRIE: Yes sir.

22     MS. MURPHY:  Yes.

23     HEARING OFFICER: Wait, one second. Okay go ahead.

1      MS. BARRIE:  And since that meeting in January of 07, has

2  there been any other meetings?

3      MS. MURPHY:  No.

4      MS. BARRIE:  And if a meeting is set up, would you attend

5  the meeting?

6      MS. MURPHY:  Yes.

7      MS. BARRIE: No more questions.

8      HEARING OFFICER: Counsel for DCPS.

9      MS. LINDSEY:  Ms. Murphy just a couple of questions to

10  follow up.

11      MS. MURPHY:  Okay.

12      MS. LINDSEY: What type of services did D████████ receive at

13  High Roads?

14      MS. MURPHY:  He is getting, I think he says each morning;

15  they do get 30 minutes of group session at High Roads.  He was

16  supposed to get special services in Math and reading, because

17  those were major problems, those two subjects.

18      MS. LINDSEY: Do they have parent-teacher conferences?

19      MS. MURPHY:  I've never been to one. They haven't sent me

20  any information about coming to a parent-teacher conference.

21  I've received things but that was like for a Christmas program,

22  things like that. But I haven't been to a teacher-parents

23  conference.

1        MS. LINDSEY: Any discussions or conversations with D████████

2    teachers or special ed coordinators?

3        HEARING OFFICER: Could you speak up a little.

4        MS. LINDSEY: I apologize.  Has there been any conversations

5    outside the January 30, 2007 meeting - have there been any:

6        MS. BARRIE: Objection. My objection is that beyond the

7    scope of my direct totally. My direct was focusing on

8    (inaudible) which was the - the - the issues that we have on the

9    table.

10       HEARING OFFICER: Response.

11       MS. LINDSEY: Well she said that there was no other meetings

12   outside the January 30, 2007 meeting I think.  So--.

13       HEARING OFFICER: So that was on direct.

14       MS. LINDSEY: That was on direct so I'm cross I'm trying to

15   determine, I'm delving into that to see if there is anything.

16       MS. LINDSEY: Have you had any conversations or discussions

17   with any of the staff at High Roads about D████████ progress.

18       MS. MURPHY:   I had ah - - but this would go back to 06.

19       MS. LINDSEY:   That's fine.

20       MS. MURPHY:   Okay, I did speak Mr. Williams about his

21   reading and about giving him more material on reading because at

22   that time, the reading still didn't seem to be making much

23   progress at that time. And he told me he would do so.  He did

1  give him a few things to bring home and I worked with him at

2  home on the books and things that he did give.

3      MS. LINDSEY:  Is Mr. Williams the only person at High Roads

4  that you've spoken to about D████████?

5      MS. MURPHY: Yes.

6      MS. LINDSEY: Okay. Do you know who his --.

7      MS. MURPHY:  Well at that time I did speak to Ms. Redmond

8  before I talked to him. You know, I told her I did want to talk

9  to him about the reading.

10      MS. LINDSEY: Ms. Redmond facilitated that discussion

11  between you and Mr. Williams.

12      MS. MURPHY:  But she sent me in to talk to him, but she

13  didn't sit in with us.

14      MS. LINDSEY: Okay, so you actually met with face-to-face.

15      MS. MURPHY:  Yes.

16      MS. LINDSEY: Was is 06 - 07 school year or 05 - 06 school

17  year.

18      MS. MURPHY:  It had to be the 06 -05 school year.

19      MS. BARRIE: Objection.

20      MS. MURPHY: No, 05 - 06.

21      MS. BARRIE: My objection still stands, it's nothing to do

22  with the IEP or the meeting at all.

23      HEARING OFFICER: All right.

1     MS. LINDSEY: I have nothing further.

2     HEARING OFFICER: Any redirect?

3     MS. BARRIE: No.

4     HEARING OFFICER: All right. Thank you very much.  Anything

5     further?

6     MS. BARRIE: No sir.

7     HEARING OFFICER: The case is submitted, unless you make

8     closing argument if you wish.

9     MS. BARRIE: Just briefly.  Just to be clear as the

10    grandmother testified that there has not been tutoring provided

11    for the student which is direct violation of the HOD's issued

12    September 1st of 05.  And the grandmother testified that there

13    has not been any notice for any further meetings since January

14    when they attempt to have the IEP meeting. And as the notes

15    reflect DCPS was supposed to have been there to review the

16    evaluation to have a psychologist present, but they were not

17    there. And as a result, the meeting was not able to move

18    forward, and therefore DCPS violated the parent's (inaudible)

19    determination September 1st, 2005 and I believe that – what I

20    request from the Hearing Officer if the Hearing Officer would

21    allow me – I didn't realize it would be opposed to, otherwise I

22    would have come in with case laws that addresses the fact that

23    the school system not complying with the Hearing Officer

1    determination or not implementing a Hearing Officer's

2    determination is in itself according to the Court, in those

3    cases, not just a denial of FAPE, but harm to the student and as

4    a result, I would request that I would like to turn it in either

5    by the end of the day or tomorrow.

6        HEARING OFFICER: On the issue of vocational assessment. Do

7    you wish to address that issue?

8        MS. BARRIE: Oh, well he is over sixteen. We requested a

9    vocational in January.

10       HEARING OFFICER: He's eighteen.

11       MS. BARRIE: Right.  The law says so – sixteen so I am – so

12   he's over sixteen years old. And as a result.

13       HEARING OFFICER: Are you telling me that High Roads doesn't

14   do any vocational related work?

15       MS. BARRIE: They don't do vocational – no sir.

16       HEARING OFFICER: So he has to go to MM Washington to get

17   the assessment?

18       MS. BARRIE: (Inaudible).

19       HEARING OFFICER: Huh? I can't hear you.

20       MS. BARRIE: I think that would be good because I do believe

21   that through vocational for his benefit would be very beneficial

22   to a student like De_____ and it would help to put together a

23   good transition plan for him and a good service plan for

43

1    D███████.

2         HEARING OFFICER: Is it - if he has a transition plan, and

3    doesn't have a vocational assessment, where is that a denial of

4    FAPE?

5         MS. BARRIE: Well according to IDEA, the transition services

6    would also include - could also include a functional vocational

7    assessment is the language that's used.  And he doesn't have

8    one. Transition services ideally done through a vocational

9    evaluation. It's kind of strange that one was done without it,

10   but that is usually - that's usually how it is done -

11   vocational. It was supposed to be done prior to the transition

12   services being provided, but apparently did a transition plan

13   without a vocational evaluation being completed.  But

14   (Inaudible) should be completed so that we note exactly what -

15   exact transition services the student is in need of. We are

16   asking for the meeting to take place before we can have the

17   vocation in hand only so that we can have an updated IEP.

18        HEARING OFFICER: Wait a minute.  The student is now how

19   old?

20        MS. MURPHY: He's seventeen.

21        MS. BARRIE: Seventeen.

22        HEARING OFFICER: Seventeen?

23        MS. BARRIE: Yes sir.

44

1        HEARING OFFICER: His last year High Roads?

2        MS. BARRIE: Yes sir.  That's another reason why we need the

3    one-on-one tutoring. Because he about to go to college and he is

4    in desperate need.

5        HEARING OFFICER: Is there any application made for Higher

6    Education?

7        MS. BARRIE: Yes!  You're talking about college, yes.

8        HEARING OFFICER: What's the deadline on that is April 15th?

9        MS. BARRIE: Right.  He has already done that.

10        HEARING OFFICER: So he has already applied to college?

11        MS. BARRIE: He has already applied.

12        HEARING OFFICER: College.

13        MS. BARRIE: Correct.

14        HEARING OFFICER: Has he heard back from any colleges?  Well

15    April 15th is the date you could hear.

16        MS. MURPHY:  Well we had been to RSA and they are waiting

17    on it - and exiting IEP from High Roads.

18        HEARING OFFICER: I understand, but has he been accepted

19    anywhere for next year.

20        MS. MURPHY: No he hasn't been accepted because they haven't

21    had the SAT.  High Roads scheduled him, was supposed him to

22    schedule him 3 different times.

23        MS. BARRIE: Talking about the SAT's. Talking about the

45

1    SAT's.

2        HEARING OFFICER: Did he take a SAT this month.

3        MS. MURPHY: They were supposed to give - they were supposed

4    to give it to him - what date was that you were supposed to go -

5    and we went.  But Mr. Morgan gave us the wrong information.

6        HEARING OFFICER: So he hasn't taken an SAT.

7        MS. MURPHY: He hasn't taken it at all. And that's our hold

8    up. We went there to Carroll when he told us to but he wasn't on

9    the list and they give us the wrong time to be there.  They told

10   us go a 9 and they said we would have had to be 7:30 because the

11   test starts at 8.  And they didn't have anything showing from

12   High Roads for him to take the test on the day we went there.

13       HEARING OFFICER: I mean the next school year - I mean

14   colleges have already made their choices.

15       MS. MURPHY: So, we talked to RSA and they said, see can get

16   that SAT and get High Roads to give us an exiting IEP and that's

17   what I've been going back and forth trying to get.

18       HEARING OFFICER: That still answer the question.

19       MS. BARRIE: No he has not been accepted in a college.

20       HEARING OFFICE: Yeah, but he is not going to be accepted

21   until he gets an SAT or ACT - and he hasn't done that.  It's a

22   little late for this year.  They've already made their

23   decisions.  It means that he has a whole year and he's not going

46

1  to be at High Roads.  The exiting IEP (Inaudible), right?

2       MS. BARRIE: To our knowledge, but I don't understand. Are

3  you talking about the case or are you just --.

4       HEARING OFFICER: Well I'm saying it doesn't - he can't get

5  into college, first you have the take, first you have to take

6  that SAT or ACT. You have to make certain steps, and then apply.

7  If he is applying to (inaudible).

8       MS. MURPHY: Well he went to the University of Phoenix and

9  they said they have a slot if we can get that information.

10      HEARING OFFICER: University of what?

11      MS. MURPHY: University of Phoenix is right here on

12  Massachusetts Avenue and they will - they are waiting for us to

13  get that information to them, but we don't it because we haven't

14  gotten yet.

15      HEARING OFFICER: University of Phoenix?

16      MS. BARRIE: It is a private school.

17      HEARING OFFICER: It's a what?

18      MS. BARRIE: It's a private college.

19      HEARING OFFICER: Private college. Never heard of it.

20      MS. MURPHY: It deals a lot with computers.  And he went

21  there --.

22      HEARING OFFICER: Is it like a community college?

23      MS. MURPHY: It's a small --.

47

1    MS. BARRIE: It's a small school.  But it's dealing with –

2  it's like the IET – sort of vocational – like DeWry University.

3  That sort of thing.

4    HEARING OFFICER: They don't need SAT's or --.

5    MS. BARRIE: No, they do.  They do.

6    HEARING OFFICER: Oh.

7    MS. BARRIE: It's not like a --.

8    HEARING OFFICER: So, he has an application in there?

9    MS. LINDSEY: Yes.  Yes.

10    MS. BARRIE: Exactly.

11    HEARING OFFICER: Good luck.  Okay. The case is submitted.

12

48

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
STUDENT HEARING OFFICE

IN THE MATTER OF D█████ W███████

HEARING DATE: SEPTEMBER 13, 2005

TRANSCRIBED BY
LEGAL PERSONNEL, INC.

49

<u>APPEARANCES</u>

HEARING OFFICER:          CHARLES JONES

DCPS:                     STEPHANIE RAMJOHN-MOORE

ATTORNEY FOR PARENT:      MS. FAMATA BARRIE & TAMIKA JONES

FRIENDSHIP EDISON
PUBLIC CHARTER SCHOOLS:   PAUL DALTON &  JESSICA SMITH

1     HEARING OFFICER: All right, we're on the record. It is

2    now 9:20 on September 13th, 2005. My name is Charles Jones and

3    I'm a Hearing Officer and I am convening an Administrative Due

4    Process on the path of D██████ W███████. This Hearing is being

5    conducted in accordance with guidelines and rights established

6    by IDEA, the rules of the Board for Education of the District of

7    Columbia and the D.C. Appropriations Act. The Hearing is to

8    determine whether or not the D.C. Public Schools have acted in

9    accordance with the applicable special education regulations.

10   Now for the purposes of the record, I'd like everyone to

11   introduce themselves. Counselor for DCPS:

12     MS. RAMJOHN-MOORE: Stephanie Ramjohn-Moore, Training

13   Advisor, District of Columbia Public Schools.

14     MS. SMITH: Jessica Smith (Inaudible)

15     MR. DALTON: Paul Dalton on behalf of Friendship Edison

16   Public Charter Schools and Charlene Glen for record of Special

17   Education for Friendship Edison Public Charter Schools is also

18   present

19     MS. BARRIE: Ms. F. Barrie, attorney for the Grandmother.

20     MS. MURPHY: Marion Murphy, Grandmother for D██████ W███████

21   and legal guardian

22     MR. W██████: I'm D██████ W███████, the Student.

23     MS. JONES: Tamika Jones, Attorney for the Student

1        HEARING OFFICER: All right Ms. Barrie do you waive the

2    formal reading of the Due Process Rights?

3        MS. BARRIE: Yes sir.

4        HEARING OFFICER: At the conclusion of this Hearing within

5    ten calendar days within the 45-day limit, I will prepare an

6    Order. That Order is appealable by either party to a court of

7    law.  Now mind the fact that is continuous, that was requested

8    by counsel for Friendship Edison.  I'm assuming there are no new

9    disclosures, Mr. Dalton.

10       MR. DALTON: I have the same assumption sir.

11       HEARING OFFICER: Do you have any new disclosures?

12       MS. BARRIE: I didn't turn in any new disclosures.

13       HEARING OFFICER: You didn't turn in any new disclosures.

14   All right let the record reflect that the disclosures have been

15   introduced into the record are also employed for this Hearing.

16   As I understand that counselor for DCPS has a preliminary

17   matter. What is that preliminary matter Ms. Moore?

18       MS. MOORE: Mr. Jones (inaudible) DCPS respectfully request

19   that we dismissed from this matter as it is my understanding

20   that we previously settled the matter with Ms. Barrie.

21       HEARING OFFICER: Ms. Barrie do you have any problem with

22   her?

23       MS. BARRIE: No sir.

52

1          MR. DALTON: I have a great deal of problem with that.  I'm

2    not a party to that Settlement Agreement.  I filed a Motion to

3    Dismiss in this matter, previous to the last Hearing Officer's

4    determination in which the Hearing Officer required DCPS to do

5    independent evaluations and consider the issue of compensatory

6    ed.  My client is only on the hook supposedly for comp ed.  That

7    matter is still has been resolved, my motion back then was

8    valid, he it even more valid now, because we've had since March

9    till now and they still haven't done it.

10         HEARING OFFICER: Haven't done what?

11         MR. DALTON: Haven't done what they were supposed to do,

12   either pursuant to the HOD or I don't know what pursuant to this

13   new Settlement Agreement or the previous Settlement Agreement of

14   2004.

15         HEARING OFFICER: Have you a copy of the last HOD?

16         MR. DALTON: Yes I do.

17         HEARING OFFICER: Have you read it?

18         MR. DALTON: Yes I have sir.

19         HEARING OFFICER: So counsel for DCPS?

20         MS. MOORE: May I be excused?

21         HEARING OFFICER: No, we're still - there's still - he is

22   opposing your motion.

23         MS. MOORE: It is my understanding the issues with the

53

1    District of Columbia Public Schools have been resolved and in

2    accordance with your last HOD (inaudible) that was submitted as

3    I told you earlier, I am filling in for one of my colleagues who

4    had a resolution meeting. I have no knowledge of the Agreement

5    or the Order that was issued.

6        HEARING OFFICER: Ms. Barrie, what's the issue relative to

7    Friendship Edison?

8        MS. BARRIE: Okay. The issue relative to Friendship Edison

9    was denial of services from September 2004 until his

10   matriculation or at High Road, and April of 2005.

11       HEARING OFFICER: The student is presently enrolled.

12       MS. BARRIE: Is now at High Road.

13       HEARING OFFICER: So you're seeking comp ed from --.

14       MS. BARRIE: For Friendship Edison because according to my

15   client, he wasn't receiving services while at Friendship Edison

16   Public Charter School from September 2004 until he left in April

17   of 2005.

18       HEARING OFFICER: So the narrow is whether or not the

19   student was receiving related services in special education

20   instruction Friendship Edison --.

21       MS. BARRIE: Precisely.

22       HEARING OFFICER: At what period of time?

23       MS. BARRIE: September of 2004 until he left in April of

54

1   2005. Now at the last Hearing we addressed DCPS's issues as far

2   as compensatory education and the Order was directed towards DC

3   Public Schools.  And as a result, my allegations now are against

4   Friendship Edison Public Charter Schools as far as my client.

5        HEARING OFFICER: What is the last HOD, you were granted

6   placement at High Roads?

7        MS. BARRIE: Before you HOD.

8        HEARING OFFICER: Right.

9        MS. BARRIE: Correct.

10       HEARING OFFICER: And what did you receive in the last HOD?

11   Did you receive comp ed services?

12       MS. BARRIE: From you?

13       HEARING OFFICER: From DCPS?

14       MS. BARRIE: They were supposed to convene to meeting to

15   address that issue and they never did, and that's why we came

16   back.

17       HEARING OFFICER:  Okay.

18       MS. BARRIE: And we were able to get the comp ed that they

19   never took care of initially from the --.

20       HEARING OFFICER:  Okay.

21       MS. BARRIE: Or the previous Settlement Agreement.

22       HEARING OFFICER:  These are not overlapping dates?

23       MS. BARRIE: No sir.

1      HEARING OFFICER:  These are --.

2      MS. BARRIE: Separate and apart.

3      HEARING OFFICER:  All right. So I'll grant your motion.

4      MR. DALTON: Just note my objection for the record, please.

5      HEARING OFFICER:  Certainly.  Let the record reflect that

6  counsel for Friendship Edison opposes the dismissal.  Now, in

7  light of the fact that we have a narrow issue here, that is that

8  you're alleging that the student did not receive special

9  instruction or related services during the period of September

10  2004 through April 2005, correct?

11      MS. BARRIE: Correct.

12      HEARING OFFICER: That is the narrow issue. So.

13      MS. DALTON: We're prepared to offer testimony on that, but

14  my problem is that supposedly under Reid, the D.C. Circuit case—

15  MS. BARRIE:

16      HEARING OFFICER:  HmmmHmmm.

17      MR. DALTON:  There are supposed to be guidelines for the -

18  the equitable relief of compensatory ed, that Judge Tallot, the

19  Court of Appeal Judge who wrote the opinion in Reid, and before

20  I was arguing my case a couple a days ago reminded me because in

21  that case I was actually representing parent on the issue of

22  comp ed in which the Court awarded four year of comp ed for the

23  four years that the child was there. Basically chided Judge

56

1  Kessler for giving one-to-one, because you're not supposed to do

2  that after Reid.

3  MS. BARRIE:

4      HEARING OFFICER:  In the Reid, and I agree with you, the

5  Reid case simply indicated that we should look at placing the

6  student in a position in which would have but for the lack of

7  services.

8      MR. DALTON: Right.

9      HEARING OFFICER:  Now that is a determination I have to

10  make.

11      MR. DALTON: Yes sir, but – but my ability to defend my

12  client was comprised when you dismissed DCPS because there is

13  now no way of knowing that taking a child from a inclusion

14  program and putting them in a full time private program didn't

15  in and of itself compensate the child to the degree to that the

16  child needed to be compensated.

17      HEARING OFFICER:  I understand your argument, but I

18  disagree in light in the fact that I have the ability, if that's

19  what your position is, that the placement of the student at High

20  Roads, would in fact place him in a position in which he would

21  have been and that's your argument. I'll have to make the

22  determination.

23      MR. DALTON: That is only part of my argument.

1      HEARING OFFICER:   Okay.

2      MR. DALTON: The other part of my argument is that my

3   disclosure specifically shows that we faxed to Ms. Barrie's

4   office and there is a fax confirmation the notes of the services

5   that we provided.   Okay and she alleges --.

6      HEARING OFFICER: The counter tracking forms?

7      MR. DALTON: Yes.

8      HEARING OFFICER:   And is that a part of the record?

9      MR. DALTON: Yes it is sir.

10      HEARING OFFICER:   Direct me to that.

11      MR. DALTON: I don't have my glasses, but let me see I can-.

12   It's 4.

13      HEARING OFFICER: Of your disclosure?

14      MR. DALTON: Yes sir.

15      HEARING OFFICER: All right. Why don't you give me the

16   benefit of the document you're looking at so that I don't have

17   go through all of this.

18      MR. DALTON:   Here's the fax confirmation sheet.

19      HEARING OFFICER: Ms. Barrie, counselor for Friendship

20   Edison has indicated that they have provided you with the

21   counter tracking forms that show that the services that were

22   warranted that were provided by the school. Have you received

23   such documentation?

58

1          MS. BARRIE: No.  As I indicated prior to Friendship – to

2     Mr. Dalton, I knew nothing of the documents and I saw a fax

3     cover page that indicates --.

4          HEARING OFFICER: Where are the tracking forms at Mr.

5     Dalton?

6          MS. BARRIE: They are not in the – .

7          HEARING OFFICER: Dalton.

8          MS. BARRIE: Oh, I'm sorry.

9          MR. DALTON: The problem is the person who had possession of

10    these documents, no longer works for us.

11         HEARING OFFICER: The counter tracking forms?

12         MR. DALTON: That's correct. So we don't --- these are

13    private contractors.  There's supposed to leave the forms in the

14    file. They often take them with them when they leave.

15         HEARING OFFICER: Well that's --.

16         MR. DALTON: We still have testimony on top of this, but

17    there is evidence that this was faxed and a confirmation. Now is

18    in real time.

19         HEARING OFFICER: Wait a minute.  What was faxed?

20         MR. DALTON: The counter tracking forms --.

21         HEARING OFFICER: Then why don't you have a copy of them

22    then?

23         MR. DALTON: Because I just explained.

1      HEARING OFFICER: So you can't ask me to make such a leap

2   Mr. Dalton.

3      MR. DALTON: Now, wait a minute, that's not true. Because

4   there is a lot of case law that says when you've made the

5   documentation in time, not in preparation for a hearing, and

6   subsequently the documents are lost, evidence of the

7   transmission of those documents in directly response to the

8   question of those documents is evidence that the documents were

9   sent.  Especially when you have a confirmation that those

10  documents were received.

11     HEARING OFFICER: I understand your position, but it would

12  seem to me that in the ordinary course of business, you would

13  keep a copy of any encounter tracking forms --.

14     MR. DALTON: If we had control of the employee, your honor.

15  They were not an employee.

16     HEARING OFFICER: So, when these documents were allegedly

17  faxed to Ms. Barrie, the subcontractor employee did it, is that

18  — what you're saying?

19     MR. DALTON: I don't know.  I don't know the answer to that.

20     HEARING OFFICER:  Well, let's go on the record.  I mean

21  let's get into the actual evidence and I'll make a

22  determination.  Who's your first witness?

23     MS. DALTON: My first witness is Charlene Glymph, Director

1   of Special Ed.

2         HEARING OFFICER:  Charlene?

3         MR. DALTON: Glymph, number 8.   G-L-Y-M-P-H.

4         HEARING OFFICER: Okay, Ms. Glymph, you want to raise your

5   right hand?  Do you swear to tell the truth, the whole truth and

6   nothing but the truth so help you God?

7         MS. GLYMPH: Yes.

8         HEARING OFFICER: Please state for the record, your full

9   name and your position with Friendship Edison?

10        MS. GLYMPH: My name is Charlene Glymph and I am the

11  Director of Special Education at Friendship Public Charter

12  Schools.

13        HEARING OFFICER: All right go forward with your

14  examination.

15        MR. DALTON: How is that you know the student D███████

16  W███████?

17        MS. GLYMPH:  He was a student (inaudible).

18        MR. DALTON: All right, and did you have any discussions

19  with either teachers or service providers with regard to

20  services and classes that D███████ was taking?

21        MS. GLYMPH:  Yes.

22        MR. DALTON: And what were those discussions.

23        MS. GLYMPH:  The initial time with D███████ was the 30-day

1    review (inaudible) of the student's raw score.  So when he

2    walked in the door, I did not assessments in place from I think

3    – (inaudible). So what we did was to give him a Woodcott Johnson

4    re-assessment to ascertain what his academic levels were and

5    then to determine if we wanted to continue with the IEP that he

6    had in (inaudible) or if we wanted to review it and you know and

7    change his goals and objectives (inaudible). At that meeting,

8    his aunt attended because (inaudible) by the notes.  So what we

9    did he was over 14 or at the age of 14, and (inaudible) planned,

10   so we put on into place and increased his hours and then he was

11   placed in a transition class with Mr. Smith. In addition to that

12   he had like six and half hours and at the back of the pages, IEP

13   having reviewed all the documents, it was recommended that

14   D█████ be maximally be included into the school. This is the

15   recommendation of Village. His performance levels at the time he

16   came into the door were not of such to put him into what our

17   resource classes were.  So we included, we changed his schedule,

18   I think it was geometry.  And I think that was like too much of

19   (inaudible), we placed him in an Algebra IB class and then an

20   inclusion teacher was faced with that teacher's plan.  An

21   inclusion teacher at that time was Ms. (inaudible).

22        MR. DALTON: To the best of your knowledge were all of the

23   services provided pursuant to his IEP?

62

1      MS. GLYMPH:  They were, including his counseling, which was

2    done in the classroom setting through his transition program.

3    We trying to infuse things, a lot of the students in the high

4    school study, don't liked to pulled out of class to come down to

5    a special education suite.

6      MS. BARRIE: On that subjection only on the basis, I

7    understand.

8      MR. DALTON: Is this a cross-examination?

9      MS. BARRIE: No. I'm objecting.  I'm objecting.

10     HEARING OFFICER: Objecting to his question, objecting to

11    what?

12     MR. DALTON: The answer, what?  Well, that's the subject for

13    cross -exam --.

14     HEARING OFFICER: Wait a minute, Mr.---.  Let me handle this.

15    She's got an objection, I'll hear the objection and I'll let you

16    respond.  What is it you're objecting to?

17     MS. BARRIE: She's giving an account of what may or may not

18    have in a classroom, that she was not in.

19     MS. GLYMPH: Well you can cross-examine her and get that

20    information out of her.

21     MS. BARRIE: All right.

22     HEARING OFFICER: I'll overrule that objection.

23     MR. DALTON: Go ahead and explain.

63

1    MS. GLYMPH: I do enter the classroom, I'm an observer and I

2  have to take in all the lesson plans, and I have copies of their

3  lesson plans in a binder.  I keep --. So I am aware that Ms.

4  Mathews went into class.  Also our speech pathologist goes into

5  that particular transitions class.  We have a lot of special

6  needs students there, so they would rotate out or choose dates

7  to go in and work with our transition specialist, which is Mr.

8  Smith and that was D██████ teacher.  That's our transitions

9  coordinator. He did have those objections so we wanted to cover

10  them.  When D█████ came to us he only like 6 hours of

11  specialized instruction.  So, and they were including him at his

12  previous school, and so we were trying to see if that setting

13  was an appropriate one for him.  And initially at the beginning

14  of the school year, he was doing moderately successfully in that

15  endeavor.  And because I had tried to get his attendance, I just

16  remembered there was a breakdown at the beginning of January.

17  Because I noticed that I had seen before and the lady here, I

18  can't remember the relationship.  I'm sorry. And I've seen him

19  and I know that there was some form of a breakdown, and I don't

20  know why my instincts say, because I cannot pull it yet.  I

21  think there was a breakdown in some of his attendance or some

22  issue that happened after January.  But in the beginning the

23  year, that was not the most appropriate placement for D█████

64

1    based on his performance and (inaudible) three, with teachers

2    going in and giving the appropriate accommodations, making sure

3    he has a calculator, making sure he has the tools to be

4    successful.  All of our general education teachers are aware of

5    our special need students, they are given a snapshot with an IEP

6    at a glance, so that they immediately know what our performance

7    levels of our kids are before they come into the class.  So they

8    know to make the necessary accommodations and then we provide

9    them, in addition to that, core services at school on Tuesday

10    and Thursdays and he was apart (inaudible) and he was invited to

11    attend those sessions also. And as counsel stated she asked why

12    would I know this. That's whats my job, to make sure that

13    related service people were in the environment that were

14    supposed to be and scheduled to be in. This was one of my new

15    babies for that school year.  Because we started noticing that a

16    lot of our students don't like to come to our suite for

17    counseling and they don't like to come for speech and language

18    services and we're trying to get out of suite and start going

19    more into the classroom and implementing strategies that they

20    would been beneficial for their academic performance in the

21    learning environment, rather than pulling them aside and then

22    doing things that were not sufficient.

23         HEARING OFFICER: Any more questions Mr. Dalton?

1          HEARING OFFICER: Do you want to cross-examine?

2          MS. BARRIE: Please.  Okay.  Do you know who his teachers

3     were?

4          MS. GLYMPH:  HmmmHmmm.

5          MS. BARRIE: Who were his teachers?

6          MS. GLYMPH:  Who are his teachers now?

7          MR. BARRIE: No.

8          MS. GLYMPH: His math teacher at the time, it wasn't

9     (inaudible) tell, Ms. Israel is his case manager, Mr. Smith is

10    his transitions teacher, now his science --  Oh shoot. His

11    social sciences --.

12         MR. BARRIE: Okay, that's fine.

13         MS. GLYMPH: And if he was (inaudible) house, then his

14    literature teacher would have been Mrs.

15         MR. BARRIE: That's okay.  That's fine.

16         MS. GLYMPH:   (inaudible).

17         MR. BARRIE: I understand that's fine.  So Ms. Frazier, Ms.

18    Penmentel sp? was two of his teachers.

19         MS. GLYMPH: That is correct.  Are you certified in special

20    education?

21         MR. DALTON: Objection. Objection.  Relevancy.

22         MS. BARRIE: Oh, okay.

23         Mr. DALTON?  The issue here is whether or not we provided

66

1    we provided the services, not whether not teachers were

2    certified and under D.C. law and federal law, it's not a

3    relevant question anyway because charter schools are exempt from

4    that requirement.  You know we're just getting into tangent upon

5    tangent.

6        MS. BARRIE: If witness is indicating that he was receiving

7    his special ed services, people who provide special ed services

8    are special ed teachers - and as a result I think it is very

9    relevant.

10       HEARING OFFICER: All right. I'll overrule the objection.

11   Can you answer the question?

12       MS. GLYMPH: Those teachers were his general education

13   teachers, Mr. Israel was his person for inclusion hours and he

14   wasn't provided special education.

15       MS. BARRIE: And he was his case manager correct?

16       MS. GLYMPH:  Case manager and math inclusion teacher.

17       MR. BARRIE: So your testimony is that Mr. Israel taught him

18   math?

19       MS. GLYMPH:  (Inaudible) He was in the classroom with Ms.

20   Pendleton. He was assigned there. And he was the person

21   responsible to make sure.  We don't do pullouts where we sit

22   with a kid.  We plan for their instruction and provide support

23   in that environment. And Mr. Israel provided support in that

67

1  environment.

2      MS. BARRIE: What I'm asking is simply this, did Mr. Israel

3  teach D████████ special education math?

4      MR. DALTON: Objection, the question has already been

5  answered, this is an --. (Whispering) For the purposes of this I

6  want to object.  What counsel is now trying to do is go to

7  methodology.  Methodology is strictly prohibited under virtually

8  every case that I ever examined. You cannot dictate to a school

9  system how they are going to provide that service.

10     HEARING OFFICER: I thought her question did Mr. Israel

11  teach, that's a yes or no.

12     MR. DALTON:  No, it's not quite a yes or no. I believe the

13  answer is yes.  But on principal I want to object to the

14  question because.

15     HEARING OFFICER: What is your response to the objection?

16     MS. BARRIE: Simply this (chuckle).  It's not a methodology

17  question; it's a simple question.  Either he taught the student

18  or did not teach the student.

19     HEARING OFFICER: I'll overrule the objection; answer the

20  question if you can?

21     MS. GLYMPH: Yes, he (inaudible) in teaching in the student.

22  But it was a collaborate effort.

23     HEARING OFFICER: That's a fine answer.

68

1    MR. DALTON: It's a principal issue, it's a principal issue,

2    it's not a legal issue.

3    HEARING OFFICER: Any other question?

4    MS. BARRIE: HmmmHmmm.  Yes there is. All right.  You

5    indicated that it is your job to know what going on with the

6    teachers and the students.  Who taught him English?

7    MS. GLYMPH: Peoples.  I knew it was going to come to me.

8    MS. DALTON: I think we are bordering on badgering. First of

9    all --.

10    MS. BARRIE: Badgering?

11    MR. DALTON: Yeah.  First of all she names three of his

12    teachers, then she says I don't need anymore.  Then she comes

13    back later with another question on another teacher and now she

14    does remember, how many do we have to give, all of them?

15    HEARING OFFICER: I think it is appropriate that counsel can

16    ask those questions, Mr. Dalton. Counsel and your client is

17    answering them so, there is not a problem.

18    MR. DALTON: I just don't like my witnesses badgered, that's

19    all.

20    HEARING OFFICER: If she's badgered, I'll make sure she's

21    not.  Go forward.

22    MS. BARRIE: Okay. So Ms. Glymph, So Ms. Pimento Frazier and

23    Peoples taught him throughout the school year?

69

1      MS. GLYMPH: HmmmHmmm.

2      MS. BARRIE:  Ms. Frazier put down she is the regular

3 education teacher, is that correct? Okay. Ms. Pimento is also

4 regular ed teacher is that correct?

5      MS. GLYMPH: That's correct.

6      MR. BARRIE: Ms. Peoples, what was she.

7      MS. GLYMPH: She is a regular education teacher.

8      MS. BARRIE: Okay.  All right, do remember who his

9 psychologist was?

10      MS. GLYMPH:  Kia Matthews.

11     MS. BARRIE: It's not Kia Lewis, It's Kia Mathews.

12     MS. GLYMPH:  Oh she's married, I'm sorry.  It's Kia Lewis

13 Mathews.

14     MR. BARRIE: Okay.  Do you know who sent me the records?

15     MS. GLYMPH:   I do not because I was the achievement

16 coordinator of special education. It was title given to me

17 because my focus was the student success in the academic

18 environment, so I don't know who took care that part or sent it

19 to you because that was not responsibility for compliance. My

20 responsibility was to make sure that services were being

21 provided and students were getting the right support, that they

22 were into access tutoring, if they needed assistance on

23 computers, and they needed assistance in technology, or they

1  needed assistance with reader, whatever their needs were, those

2  were my responsibilities.

3      MS.BARRIE: And you are saying that D██████ needed tutoring?

4      MS. GLYMPH: We offered all of our students tutoring. Any

5  time there is a deficit.

6      MS. BARRIE: You offered him tutoring.

7      MS.GLYMPH: We offer all special education students

8  tutoring.

9      MS. BARRIE: Okay. Is there any particular reason if they

10 thought he needed tutoring, the tutoring that he did not get

11 more areas of services, is there any reason, if he needed extra

12 help as a special needs student?

13     MS. GLYMPH: A lot of our students have come from

14 environments where they were not expected to achieve, and so

15 they been given grades, (inaudible) history and they have not

16 taken part in classes, so we try to encourage them as far self-

17 advocating.

18     MS. BARRIE: HmmmHmmm.

19     MS. GLYMPH: We try to encourage them to reach out and ask

20 questions and D██████ is very inverted.  He is like a very quiet

21 student and he kind of like blend into the scene.  So anytime we

22 try to bond with them and offer them assistance, we're doing

23 homework. A lot of time a lot of kids don't have anyone at home

71

1    to say, parent's like they are in high school, they can do the

2    homework on their own.  So what we do is to extend ourselves the

3    opportunity here, we'll do homework with you.  Our tutoring

4    sessions were on Tuesdays and Thursdays, and in addition to

5    that, on Saturdays we would have the school open and available

6    to special needs students. But that's not just for D███████,

7    that's for any student. If they have a project, understanding

8    that a special education student whose coming into a high school

9    where it's very academic and it becomes challenging.  They may

10   need assistance projects and things like that, we have the

11   access, we have computers, we have everything that they need

12   there.  So it's like, come on it. Do you homework, get support,

13   get what you need and start making that transition.  And my

14   focus last year was watching the start of year (inaudible) they

15   can before.  And D███████ was one of our school students who

16   had a lot of skills. (inaudible)—and then it all came, he has a

17   lot of skills, he has a potential, he has great abilities, he

18   just needs the right support and (inaudible).

19        HEARING OFFICER: Any redirect?

20        MR. DALTON: Nope.

21        HEARING OFFICER: Let me ask you a couple of questions. You

22   monitor specialized instructions and related services.

23        MS. GLYMPH:  No I don't monitor.  I do monitor related

1    services.  But I have to make sure that the class were being

2    conducted.  But I monitor instruction. All of the teachers, any

3    questions that need to be answered, any (inaudible).

4         HEARING OFFICER: Now the individuals who provided the

5    direct related services, were contractors?

6         MS. GLYMPH: HmmmHmmm.

7         HEARING OFFICER: Now who were the contractors who provided

8    D█████ W██████?

9         MS. GLYMPH: He doesn't have speech, so – I mean.  Ms.

10   Mathews is his only related service provider.

11        HEARING OFFICER: And she is a teacher at Friendship?

12        MS. GLYMPH: She was a psychologist.  Our teacher was Mr.

13   Israel and he has parted with us and that always becomes an

14   issue.

15        HEARING OFFICER: So your testimony here today is that

16   D█████ W██████ was provided specialized instruction and related

17   services for that period of time.

18        MS. GLYMPH: And support after school.

19        HEARING OFFICER: And when you're saying support, you're

20   talking about tutoring?

21        MS. GLYMPH: I do mail-outs as well as when he comes to our

22   meetings, it is told to the parent, I've even sent out

23   newsletter to let them know that these are start-ins, and there

1   for every special education student that's in our academy.

2       HEARING OFFICER: All right.  Any other witnesses?  All

3   right, your witness, your case.

4       MS. BARRIE: Let's let D▇▇▇▇ go first.

5       HEARING OFFICER: Okay, D▇▇▇▇ raise your right hand. Do

6   you swear to tell the truth, the whole and nothing but the truth

7   so help you God?

8       MR. W▇▇▇▇: Yes sir.

9       HEARING OFFICER:  Please state for the record your full

10  name and your residence.

11      MR. W▇▇▇▇:  D▇▇▇▇ (Inaudible).

12      HEARING OFFICER: Speak up just a little louder.

13      MR. W▇▇▇▇: My name is D▇▇▇▇ --.

14      HEARING OFFICER: Put the microphone so its --.

15      MR. W▇▇▇▇: I live with my grandmother at 5019 11th Street,

16  North East.

17      HEARING OFFICER: Okay. Go forward with your examination.

18      MS. BARRIE: D▇▇▇▇ when you were at Friendship Edison, how

19  many students were in your classroom?

20      MR. W▇▇▇▇: About 15 to 20.

21      MS. BARRIE:  Okay, 15 to 20 students. And in that

22  classroom, do remember receiving any special education services?

23      D▇▇▇▇ W▇▇▇▇:  No, not really. It was very rare.  In my

74

1    math class, Mr. Israel he'll come in there, he'll copy down math

2    problems and go check around and ask anybody if they need help,

3    then he is usually gone and then come back.

4        MS. BARRIE:  So he wasn't in the classroom?

5        D▬▬▬ W▬▬▬:  No much.

6        MS. BARRIE:  Your English class was taught by Ms. Peoples?

7        D▬▬▬ W▬▬▬:  Yes.

8        MS. BARRIE:  Okay.  Do you remember receiving any special

9    ed in that class?

10       D▬▬▬ W▬▬▬:  No.

11       MS. BARRIE:  How about with Ms. Frazier?

12       D▬▬▬ W▬▬▬:  No.

13       MS. BARRIE:  And Ms. Pimento?

14       D▬▬▬ W▬▬▬:  As I said, Mr. Israel he just came in

15   there--.

16       HEARING OFFICER: Speak up a little bit.  Speak up a little

17   louder.

18       D▬▬▬ W▬▬▬:  As I said Mr. Israel he just came in and

19   supplied with things we needed, copy down the math problems just

20   was on the board, just for the morning warm-up then, he's out of

21   there.

22       MS. BARRIE:  How about Ms. Mathews?  Did you get counseling

23   from Ms. Mathews?

75

1      D██████ W██████:   Towards April when I was transferring to

2      - over to High Roads.   That's when I start seeing her.

3      MS. BARRIE:   Okay.

4      HEARING OFFICER: Cross-examination?

5      MR. DALTON: Yes.   D██████ did you see Ms. Mathews in your

6      transition class?

7      D██████ W██████:   She came - I only seen her once or twice.

8      MS. DALTON: Was she in the class?

9      D██████ W██████:   Yes, she stayed in there once or twice,

10     one or two days.   That's all the times I saw him. She spoke to

11     me.

12     MR. DALTON: Did she speak to other students?

13     D██████ W██████:   She pulled, I mean I seen when she come

14     in for when they had speech late, and she in there and pulled

15     them out and they went downstairs.

16     MR. DALTON:   So unless she pulled you out of class, you

17     didn't feel like you were getting your counseling is that your

18     testimony?

19     D██████ W██████: No, she didn't have to pull me out of

20     class, because she only spoke to me once or twice.   And other

21     than that, I didn't have nothing else.

22     MR. DALTON: When Mr. Israel asked if anybody needed help,

23     did you tell him you needed help?

1          D██████ W███████:  I raised my hand and I even called him

2    other there, he just supplied me with calculator and pencil.  He

3    copied down the math problem. I told him, yes I needed help, but

4    most of the time when he does that he gets sidetracked by

5    another kid and he goes straight then, and just forget that I

6    still needed the help.

7          MR. DALTON: Did he ever change the lesson plans?

8          D██████ W███████:  No.

9          MR. DALTON: Never?

10         D██████ W███████  Not that I know of because I mean he came

11   in there, he copied down the math problems and just left.

12         MR. DALTON: Okay. Nothing further.

13         HEARING OFFICER: Any redirect?

14         MS. BARRIE:  No sir.

15         HEARING OFFICER: D██████, do you know what specialized

16   instructions are?

17         D██████, W███████:  No.

18         HEARING OFFICER: Would you know if you received them or

19   would receive them?

20         D██████ W███████:  I getting an idea that specialized

21   instruction is that he come in there and help me out in a

22   certain subject or something like that.

23         HEARING OFFICER: How are you doing at High Roads?

77

1    D▆▆▆▆▆ W▆▆▆▆▆:  I'm doing good.

2    HEARING OFFICER: All right. Any other witnesses?

3    MS. BARRIE: I have the grandmother, Ms. Murphy.

4    HEARING OFFICER: Ms. Murphy, you want to raise your right

5    hand?

6    MS. MURPHY: Yes.

7    HEARING OFFICER: Do you swear to tell the truth, the whole

8    truth and nothing but the truth so help you God?

9    MS. MURPHY: Yes I do.

10    HEARING OFFICER: All right, please state for the record,

11    your full name and your address?

12    MS. MURPHY:  Marian Murphy, 5019 11th Street, North East.

13    HEARING OFFICER: All right, go forward with your

14    examination.

15    MS. BARRIE:  Ms. Murphy did you speak to anyone at

16    Friendship Edison in reference to services for D▆▆▆▆▆?

17    MS. MURPHY:  Yes.

18    HEARING OFFICER: What kind of services?

19    MS. BARRIE:  Special education services, if he was

20    receiving special education services?

21    MS. MURPHY:  Yes.

22    MS. BARRIE:  Okay, who did you speak to?

23    MS. MURPHY:  I spoke to Mr. Israel.

1       MS. BARRIE:  Okay. And in your conversations with Mr.

2   Israel, did you address the issue as to whether he was receiving

3   his special education services?

4       MS. MURPHY:  Yes I did.

5       MS. BARRIE:  And his response was what?

6       MS. MURPHY:  I talked to Mr. Israel because at first when

7   he placed into geometry, I knew he wasn't really ready for

8   geometry because he was still having a lot of problems, other

9   problems with fractions and multiplication and things like that.

10      MS. BARRIE:  HmmmHmmm.

11      MS. MURPHY:  So when I talked to Mr. Israel, I told him

12  that was too much for him.

13      MS. BARRIE:  HmmmHmmm.

14      MS. MURPHY:  I asked him if he could move back to another

15  to another – you know a lower math class and he said he would be

16  moved back and I asked him about special ed.  And he told me

17  that that wasn't really recommended for him at this time. That

18  he would be in a regular classroom and he would receive

19  assistance.

20      MS. BARRIE:  Do you talk to any of his teachers?

21      MS. MURPHY:  Yes, I did. I remember talking to Ms. Peoples.

22      MS. BARRIE:  Okay. And what was the discussion with Ms.

23  Peoples?

1    MS. MURPHY:  I was letting her know that as far as the

2    English was concerned, that he wasn't receiving the services

3    that he needed because he couldn't keep with you know with the

4    class and work that he was given.  And she told me he would need

5    to come back to evenings to get special services, but that they

6    had tutoring on Tuesdays I think and Thursdays.  And he could go

7    there from 3 to 4.

8    MS. BARRIE:  Okay.  What did she say about him getting

9    special ed during the day.

10    MS. MURPHY:  She said if he needed help, he could come to

11    the desk and ask for special help if needed help.

12    MS. BARRIE:  Okay.  The – you heard that they did an IEP

13    for him when he first got there because of his old IEP was not

14    up to par.

15    MS. MURPHY:  Yes.  Yes.

16    MS. BARRIE:  To your knowledge do you know if he was

17    getting the 12½ hours of specialized instruction of special

18    education services?

19    MS. MURPHY:  No special education.

20    MS. BARRIE:  To your knowledge do you know if was getting

21    30 minutes of counseling a week, to your knowledge do you know?

22    MS. MURPHY:  No.  Because I asked him about the counseling,

23    and he wasn't getting it.

1          MS. BARRIE:  No more questions.

2          HEARING OFFICER: Cross exam?

3          MR. DALTON: Ms. Murphy is - in your mind is special ed

4    specialized instruction, does it have to be given in a separate

5    resource room.

6          MS. MURPHY: I would think it would be given in a classroom

7    with kids that's on the same level with so that they could

8    explain it to him and bring him up and he wouldn't feel isolated

9    by being in a regular classroom where the kids were, you were

10   past what he was doing.

11         MR. DALTON: Okay.  No further question.

12         HEARING OFFICER: All right.   Any other witnesses?

13         MS. BARRIE: No sir.

14         HEARING OFFICER: All right, want to do the summary?  Want

15   to do the summary?

16         MS. DALTON: My witness basically established our burden of

17   proof. I think Ms. Murphy is like a lot of parents. I mean - the

18   difference between an inclusion program and a separate classroom

19   is hard to distinguish and a lot of people have in their mind if

20   they are not in resource room, they are not getting special ed,

21   but they were.  And I can understand why she thought he wasn't

22   getting services, because they weren't delivered in a regular

23   classroom.  And that is not her definition of special ed. But

1    that is not the legal definition.

2         HEARING OFFICER: Okay.

3         MS. BARRIE: There has not been evidence presented by

4    Friendship Edison that the student was receiving the services.

5    They have presented any counter tracking forms, and Friendship

6    Edison has been on notice that that was the main issue.  There

7    has not been any related service providers to testify that

8    services were provided.  They have not been any teachers to

9    testify that they provided the services to the student.  As the

10   student indicated, he is told if he needs help to come up the

11   desk, and we'll help you. He is in a class with 15 to 20. He

12   supposed to be according to his IEP, that Friendship Edison

13   themselves admitted they did.  He is supposed to be at least 12½

14   hours out --.

15        HEARING OFFICER: What IEP are you reading from and what is

16   the date?

17        MS. BARRIE: It's September 17, 2004; Its DW14 and also

18   Friendship Edison document number 3.

19        HEARING OFFICER: Okay.

20        MS. BARRIE: September 17, 2004 IEP in which he was supposed

21   to receive 12½  of specialized instruction and 30 minutes of

22   counseling a week. And according to that IEP, he supposed to be

23   40% out of regular education setting. But it sounds he has

1  always been in a regular ed classroom. He never left. He didn't

2  go to a resource classroom.

3      MR. DALTON: (Inaudible - mumbling). Background talking.

4      MS. BARRIE: And I hear testimony that they don't do

5  resource classrooms or that they didn't do it for him, let's put

6  it that way.  They didn't do for him.

7      MR. DALTON: (Inaudible) background talking.

8      HEARING OFFICER: Can we have a little bit of decorum.  I

9  don't allow her talking while you were doing this Mr. Dalton.

10  This is really disrespectful.

11      MR. DALTON: I apologize.

12      HEARING OFFICER: You and your client have to have some

13  decorum in this process.

14      MR. DALTON: I understand, my apologies.

15      HEARING OFFICER: Go ahead.

16      MS. BARRIE: According to testimony, he was not 40% out of

17  regular education setting. He was in a regular education setting

18  the entire time.  There has not been any testimony here

19  presented by anyone from Friendship Edison Public Charter School

20  to indicate that the student received any of his services.  The

21  student is clear, he is eloquent, he did not stutter, he did not

22  say I don't know anything. He indicated exactly what he was

23  getting. Mr. Israel the one person who may have been certified

1    in special ed or who could provide special education services

2    came in, gave a piece of paper and walked out.  That's not

3    providing services. Anyone can do that.  We have a little girl

4    go get him a piece of paper and say do this and leave.  That is

5    not providing services.  So therefore, we maintain that the – as

6    the grandmother testified, as D█████ testified he was not

7    receiving his services; the grandmother testified that she was

8    told by the teacher he has to come after school to get any kind

9    of special services. That he can't get it in classroom. If he

10   needs help he can up to the desk and say I need help. But that

11   doesn't happen for a student who needs 40% of special ed –

12   special education services. So therefore, in fact the team

13   indicated at the meeting that he needed tutoring, and if they

14   are telling him he needs tutoring, then why didn't they give him

15   the services.  They didn't. And as a result, Friendship Edison

16   has not made its burden in this case.  Friendship Edison had

17   denied him a clear focal public education for seven out of the

18   nine months of the school year, which is almost the entire

19   school year. And we all know that in the student's life, a

20   school is year is way more than just a year.  Especially a

21   student who is in need of special education services.  Therefore

22   we are asking the Hearing Officer to find the Friendship Edison

23   denied FAPE and owes him compensatory education for that denial

1   of FAPE.

2       HEARING OFFICER: All right, thank you very much.

3       MR. DALTON: I have the burden, I believe I am entitled to

4   (inaudible).

5       HEARING OFFICER: Yes you are.

6       MR. DALTON: Thank you.  I'm offended by counsel's

7   arguments.  The reason I am offended is because I think the

8   Hearing Officer noted that my client was pretty elegant in her

9   testimony.  She says there was not testimony before you that he

10  received the services and yet, this person. Now we can't help

11  the employee doesn't work for us. We can't compel an employee

12  Mr. Israel to come here. We can't get someone who no longer

13  works for us to come here.  She wants to ignore that the time,

14  not in preparation for the Hearing, at the time sent the fax and

15  we have a confirmation. And she wants you to completely ignore

16  that.  We have the testimony of Ms. Glymph saying that she was

17  responsible for making sure that services were provided.  And

18  they were.  I mean there is a lot of evidence not only did we

19  meet our burden, but we actually excelled in regard to this

20  student.  We didn't take the IEP like most schools do and just

21  follow it.  We examined it and realized it was undervalued and

22  increased it.  Then we made sure that since we knew that this

23  child needed more services that we assisted in getting him into

85

1  a full time placement. We did all of that into a very short

2  period of time, six months.  So, saying we did not service this

3  child is really an insult.

4      HEARING OFFICER:  All right thank you very much the Hearing

5  is adjourned.

6

7